34 C.C.P.A. (Patents)

### Application of POTTS.
### Patent Appeal No. 5243.

Court of Customs and Patent Appeals.

Feb. 11, 1947.

Rehearing Denied March 21, 1947.

Walter H. Pumphrey, of New York City, and John B. Brady, of Washington, D. C., for appellant.

W. W. Cochran, of Washington, D. C. (H. B. Ledman, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

The application for patent here involved relates to a process for treating garbage by which the garbage allegedly is converted "into a completely and permanently stabilized product of exceptionally high fertilizer value."

The Primary Examiner rejected all the claims, numbered 1 to 8, inclusive. Appeal was taken to the Board of Appeals. Before that tribunal appellant moved to dismiss as to claims 7 and 8, which motion was granted. The board affirmed the examiner's rejection of the other claims and appellant brings the matter before us for review. All six of the claims before us are method claims. The application contains no drawings.

The brief on behalf of appellant states that claim 1 is illustrative. It reads:

"1. The method of converting garbage into a permanently stabilized fertilizer, which consists first, in finally dividing the garbage to reduce it to a pulpy consistency and thereby condition it for economic transportation and rapid subsequent treatment; second, in delivering the pulp to a stabilizing plant by flowing it through sewers leading to the plant and there separating the organic solids from the liquid; third, in bedding the solids in housed-in enclosures at the stabilizing plant to further reduce the liquid content of the material and promote the development of fungi growth therein; and fourth, in maintaining conditions of air, light, heat and moisture, substantially

as described in the housings favorable to rapid growth in the beds of stabilizing fungi which reduce the mass to a dry, pulverent, non-odorous material suitable generally for use as a fertilizer."

Claims 2, 3, 4, and 5 are expressly made dependent on claim 1, and no one of them embraces a limitation which requires that it be considered independently of claim 1. We think it apparent that claim 6 may not properly be held patentable unless claim 1 be held patentable, but its phraseology aids in understanding appellant's method and we quote it:

"6. The method of converting garbage into a permanently stabilized fertilizer, which consists first, in districting towns, cities and other occupied sections and locating a garbage receiving station in each district; second, in utilizing a short haul trucking system in each district for collecting and delivering the garbage to the district garbage station; third, in finely dividing the garbage at each district station to reduce it to a pulpy consistency and flowing the pulp through sewers to a stabilizing plant serving the several district stations; fourth, in dewatering and bedding the pulp in housed-in enclosures at the stabilizing plant to further reduce the liquid content and promote the development of fungi growth therein; and fifth, in maintaining conditions of air, light, heat and moisture, substantially as described within the housings favorable to the rapid growth in the beds of stabilizing fungi which reduce the mass to a dry, pulverent, non-odorous material suitable for general use as a fertilizer."

The following patents are listed as references:

Wallace, 1,260,103, March 19, 1916.

Peck, 1,392,211, September 27, 1921.

Fox et al., 1,543,154, June 23, 1925.

Cooke, 1,597,724, August 31, 1926.

Boggiano-Pico, 1,832,179, November 17, 1931.

Fischer, 2,097,454, November 2, 1937.

Proctor, 2,285,834, June 9, 1942.

The statement of the examiner following the appeal to the board discloses that all six of the claims on appeal were rejected by him on various grounds, viz.: (1) On the Fox et al. patent, (2) as "aggregative," (3) as "functional and indefinite," and (4) as being "drawn to subject matter. [newly proposed by amendment] not originally disclosed and * * * not supported by the original disclosure." Further, the phrase "substantially as described" appearing in claims 1 and 6 was "considered to violate R.S. § 4888 [35 U.S.C.A. § 33]." The statement also discloses that claim 6 was additionally rejected as being "drawn to subject matter not patentable within the meaning of R.S. § 4886 [35 U.S.C.A. § 31]."

In its decision approving the action of the examiner, the board said, inter alia:

"We have carefully considered the claims in the light of the references cited and the examiner's statement and applicant's brief. * * * The reasons and grounds of rejection are so fully set forth in the examiner's statement that no amplification appears to be necessary here * * *."

In a decision responding to a petition for reconsideration the board said:

"We intended our decision to be understood as affirming the examiner's rejections of claims 1 to 6 as aggregative, indefinite and as drawn to matter not originally disclosed, and claim 6 as drawn to subject matter not patentable under the statutes and as approving the reasons for these rejections as set forth in the examiner's statement on appeal."

Appellant's brief asserts, inter alia:

"* * * there was a complete misconception of the [referring to appellant's claims] invention by both the Primary Examiner and the Board, in insisting upon and persisting in construing it according to their own theoretical interpretation and contrary to and in defiance of appellant's showing that both were clearly in error."

Before proceeding to a discussion of the arguments made before us on behalf of appellant, we quote the following from the specification of the Fox et al. patent:

"In a typical embodiment of the invention, the garbage is collected in the usual manner and conveyed to a central point where the grinding or crushing apparatus

is located. Any type of grinding machine which will reduce the garbage and other refuse to a finely divided state may be employed. From the grinding machine, the ground garbage is then conveyed to the putrefying tanks. The grinding machine may be located adjacent the tanks and the ground material fed directly into the tanks, or the material may be conveyed after grinding through the ordinary sewer pipes of a city to the sewerage disposal plant in a city where the sewerage is disposed of by putrefaction and treated in the tanks forming a part of the sewerage system. The action of the ground garbage in the putrefying tanks is similar to the action of sewerage disposal. As stated, any type of tank, such as the ordinary septic tank or an Imhoff tank may be employed. The garbage in its divided condition is fed into the tank and the solids separate and enter the sludge chamber at the bottom. The liquid effluent is discharged from the top of the tank in the usual manner and passed over suitable filter beds into a stream or other body of water. The solid matter is allowed to remain in the tank until putrefaction is complete. While the period of putrefaction may vary, we have found in actual practice that a period of about six months is sufficient to cause complete putrefaction of the solid matter. At the end of six months, the sludge formed is tapped from the bottom of the tank at intervals and dried in any suitable manner as by allowing it to form in a bed or on the adjacent surface and dried under the effects of the sun. The dried material may then be employed for fertilizer.

"Disposal of garbage in this manner is not accompanied by disagreeable odors and a plant of this character may be conducted at a minimum expense after the initial installation. The cost of the tanks forming a part of the apparatus is less than the cost of an incinerating plant, the labor incident thereto is much less, and the use of fuel is eliminated."

The claim of the Fox et al. patent reads:

"The process of disposing of garbage which comprises reducing it to fine particles by mechanical means, and then passing the finely divided garbage through a sewerage putrefaction system to putrefy it."

The claims of appellant embrace functional statements, and statements of alleged results. These lend nothing to patentability. In order properly to compare the claims with the prior art, we disregard such statements of function and alleged results, and state only the steps which make up the process. In so doing, we conform to appellant's arrangement, as expressed in the claims.

The first step of appellant's process expressed in claim 1, supra, is "finally dividing the garbage." This step is expressed in claim 6, supra, in substantially the same phraseology.

The specification of the Fox et al. patent, supra, teaches the grinding of garbage to "a finely divided state."

The second step of appellant's process expressed in claim 1, supra, seems to be divisible into two parts, viz.: (a) "delivering the pulp [which is the finely divided garbage in semiliquid form] to a stabilizing plant by flowing it through sewers leading to the plant," and (b) "there separating the organic solids from the liquid." The step is substantially expressed in claim 6.

The Fox et al. patent, supra, teaches that the ground material may be conveyed through the ordinary sewer pipes of a city to the sewerage disposal plant of the city and into tanks where the liquid is separated from the solids.

The third step, as expressed in claim 1, is "bedding the solids in housed-in enclosures at the stabilizing plant." The step is also expressed in claim 6.

Just what is meant by the phrase "housed-in enclosures" which is used in the specification, as well as in the claims, we are unable to determine. The specification makes no explanation of it, nor is there anything to indicate "bedding," or "storage," of solids otherwise than in a tank.

The specification of the Fox et al. patent, supra, teaches depositing the solid matter remaining after steps corresponding to steps 1 and 2 of appellant's process have been taken in a tank where it remains until putrefaction is completed.

The fourth step in claim 1, repeated in substance in claim 6, is "maintaining conditions of air, light, heat and moisture, sub-

stantially as described in the housings." We assume the phraseology means maintaining in the housings conditions of air, light, heat and moisture, substantially as described in the specification.

The patent to Fox et al. makes no reference to maintaining conditions of air, light, heat and moisture. So, the patent to Fox et al. does not seem to have anticipated that particular step.

The difficulty confronting appellant relative to that step, however, is that his specification fails to describe "substantially," or otherwise, what the "conditions of air, light, heat and moisture" are. The only matter indicated in the specification seems to be that the conditions should be "favorable to the rapid growth of fungi in beds." That certainly cannot be regarded as sufficiently definite to meet the requirement of R.S. § 4888, U.S.C., Title 35, § 33, 35 U.S. C.A. § 33, that in order to receive a patent the person applying shall file a written description, stating "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same."

During the prosecution of the application in the Patent Office appellant, seemingly after a rejection by the examiner, sought to amend the application in order to include a further statement relative to conditions of air, light, heat and moisture. The proposed amendment was, in effect, denied because, in the opinion of the examiner, it presented new matter.

That phase of the controversy is not before us, but we have examined the subject matter of the proposed amendment and we can find nothing therein which in reality clarifies the meaning of the original specification.

It may be said at this point that the gravamen of appellant's argument before us as to the rejection upon the patent to Fox et al. is that appellant's process results in the growth of fungi while the process of the Fox et al. patent (and the process described in other of the cited patents) results in the production of bacteria.

The Fox et al. patent does not state what substance the process therein described produces which leads up to the final production of fertilizer; that is, it does not use either the term bacteria or the term fungi. Since the processes, so far as appellant's is understandable, are substantially the same, it would seem probable that the result of the patent process is fungi of the same kind as that of appellant's process. Both bacteria and fungi are vegetable products, and appellant's specification fails to point out any distinction between them. The examiner aptly stated:

"Applicant argues that his process is far quicker than that shown by Fox and that the latter shows putrefaction by means of bacteria but not fungi. Nowhere in the present specification does applicant show the source of such fungi. Applicant further fails to mention any bacterial action, and in no way shows why his particular putrefaction should be produced by fungi, while that of the prior art is produced by bacteria. The conditions, as far as they are disclosed are exactly the same as those disclosed by Fox or by any one of the other patents showing the fermentation of garbage. Applicant's only positive disclosure it [is] that the garbage is pulped, mixed with ripened sewage sludge, and allowed to ferment. This is not only shown by Fox, but also by each one of the other patents cited."

It does not seem necessary to further discuss the case. From what has been stated, we think it obvious that the appealed claims were properly rejected as presenting nothing patentable over the prior art cited. We also think the rejection upon each of the other grounds hereinabove recited was proper.

The decision of the board is affirmed.

Affirmed.